

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Newport News Division**

PRINCE JHAMIER BELL

Petitioner,

v.

**Criminal No. 4:13-cr-49**

UNITED STATES OF AMERICA,

Respondent.

### *MEMORANDUM OPINION & ORDER*

Before the Court is Prince Jhamier Bell's ("Petitioner") motion requesting compassionate release pursuant to 18 U.S.C. § 3582(c). ECF No. 122. The Government opposed the motion and Petitioner did not reply. ECF No. 128. This matter is now ripe for judicial determination. For the reasons below, Petitioner's motion is **DENIED.**

### I. FACTUAL AND PROCEDURAL HISTORY

On April 10, 2013, Petitioner were named in a Two-Count Indictment charging him with Obstruct, Delay, and Affect Commerce by Robbery, in violation of 21 U.S.C. 1951(a) and 2 (Count One) and Brandish a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. 924(c) and 2 (Count Two). ECF No. 13. On September 3, 2013, Petitioner pled guilty to Counts One and Two of the Indictment. ECF Nos. 59, 60. According to his Presentencing Report ("PSR"), on January 6, 2013, Petitioner entered a Shell Gas Station, pushed the customer who was standing at the counter out of the way, pulled out a firearm, and took approximately $131.00 from the cash register. ECF No. 115 at ¶ 5. The robbery was captured on video surveillance and based upon a description of the defendant given by the clerk, the police apprehended Petitioner. *Id.* Another officer transported the clerk to the scene and the victim identified Petitioner as the robber of the Shell station. *Id.* After his arrest, Petitioner engaged in telephone conversations with a confidential

1

source, wherein Petitioner directed this individual to find the gun used in the robbery and to threaten and harm the victim. *Id.* at ¶¶ 7-12. In his PSR, Petitioner reported his overall health as good and noted no history of any serious or chronic medical conditions. *Id.* at ¶ 74. It was also noted that Petitioner was diagnosed with asthma and chronic bronchitis. *Id.* Petitioner was assessed a total offense level of 23, a criminal history category IV, and a recommended guideline provision of 70 to 87 months, plus 84 months, consecutive, imprisonment *Id.* at ¶¶ 111-113. On January 6, 2014, the Court imposed a sentence of One Hundred Forty-Four (144) months imprisonment, consisting of 60 Months on Count One and 84 Months on Count Two, all to be served consecutively, and followed by five years of supervised release. ECF Nos. 76, 78. Petitioner is currently incarcerated at Thomson USP, in Illinois, and scheduled for release on November 27, 2023. ECF No. 127.

On December 28, 2020, Petitioner filed his *pro se* motion for compassionate release. ECF No. 112. On January 8, 2021, Petitioner filed a supplemental motion. ECF No. 116. On March 8, 2021, Petitioner filed a motion through counsel. ECF No. 122. On March 19, 2021, the Government opposed the motion. ECF No. 128. Petitioner has not replied.

Petitioner requests compassionate release because of the ongoing COVID-19 pandemic. ECF Nos. 112, 116, 122. Petitioner argues that the presence of COVID-19 at Thomson USP presents extraordinary and compelling reasons to warrant his release. *Id.* Accordingly, Petitioner requests that the Court grant him compassionate release and allow him to begin supervised release.

## II. LEGAL STANDARD

### A. The Exhaustion Requirement

A petitioner may bring a motion to modify his or her sentence "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons ("BOP") to bring a

motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Accordingly, a petitioner seeking compassionate release is generally required to exhaust his or her administrative remedies prior to bringing a motion before the district court. *Id.* However, the exhaustion requirement may be waived under the following circumstances: (1) the relief sought would be futile upon exhaustion; (2) exhaustion via the agency review process would result in inadequate relief; or (3) pursuit of agency review would subject the petitioner to undue prejudice. *United States v. Zukerman*, 2020 WL 1659880, at *3 (S.D.N.Y. Apr. 3, 2020) *citing Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019). The COVID-19 pandemic, which could result in catastrophic health consequences for petitioners vulnerable to infection, implicates all three exceptions justifying the waiver of the exhaustion requirement. *Miller v. United States*, 2020 WL 1814084, at *2 (E.D. Mich. Apr. 9, 2020); *United States v. Zukerman*, 2020 WL 1659880, at *3 (S.D.N.Y. April 3, 2020); *United States v. Perez*, 2020 WL 1456422, at *3–4 (S.D.N.Y. Apr. 1, 2020); *United States v. Gonzalez*, 2020 WL 1536155, at *2 (E.D. Wash. Mar. 31, 2020).

**B. The Compassionate Release Standard**

As amended by the FIRST STEP Act, a court may modify a term of imprisonment on the motion of the petitioner after considering the factors set forth in 18 U.S.C. § 3553(a) if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). "Extraordinary and compelling reasons" was previously defined by the United States Sentencing Commission ("Sentencing Commission") in U.S.S.G. § 1B1.13, Application Note 1. Before the passage of the FIRST STEP Act, the Sentencing Commission provided that a sentence may be modified due to the petitioner's medical condition, age, or family circumstances and further defined the limits under which a sentence reduction may be given under those justifications.

3

U.S.S.G. § 1B1.13, n. 1 (A)–(C). The Sentencing Commission also provided a "catch-all provision" that allowed for a sentence modification upon a showing of "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* at n. 1 (D). Use of the "catch-all provision" prior to the FIRST STEP Act was severely restricted because it required approval from the BOP before an individual could petition the district court for relief. *Id.*

However, U.S.S.G. § 1B1.13 is now outdated following the passage of the FIRST STEP Act, which allows individuals to petition the district court directly without clearance from the BOP. As such, U.S.S.G. § 1B1.13 is merely advisory and does not bind the Court's application of § 3582(c)(1)(A). *McCoy v. United States*, 2020 WL 2738225, at *4 (E.D. Va. May 26, 2020); *see also United States v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020) ("[T]he Court may independently evaluate whether [petitioner] has raised an extraordinary and compelling reason for compassionate release ... [but § 1B1.13's policy statement] remain[s] as helpful guidance to courts...."); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[T]he Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive"). A petitioner's rehabilitation standing alone does not provide sufficient grounds to warrant a sentence modification. 28 U.S.C. § 994(t). In sum, the Court may consider a combination of factors, including but not limited to those listed in U.S.S.G. § 1B1.13, in evaluating a petitioner's request for a sentence modification under 18 U.S.C. § 3582(c)(1)(A)(i).

### III. DISCUSSION

**A. The Exhaustion Requirement**

The Court finds that Petitioner did exhaust his administrative remedies prior to bringing

4

his motion. On September 30, 2020, Petitioner submitted a handwritten request for compassionate release to the Warden at Thomson USP. ECF No. 116 at Exhibits 1 and 2. On November 5, 2020, the Warden denied Petitioners request. *Id.*; *see also,* ECF No. 128. Thus, more than 30 days passed since Petitioner filed his request with the Warden. ECF Nos. 122, 127.

**B. Petitioner's Compassionate Release Request**

The Court now turns to whether Petitioner has set forth extraordinary and compelling reasons to modify his sentence because of the grave risk COVID-19 poses to individuals with underlying health conditions. During the COVID-19 pandemic, federal courts around the country have found that compassionate release is justified under the circumstances. *Zukerman,* 2020 WL 1659880, at *4 *citing Perez,* 2020 WL 1546422, at *4; *United States v. Colvin,* 2020 WL 1613943, *4 (D. Conn. Apr. 2, 2020); *United States v. Rodriguez,* No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020); *United States v. Jepsen,* No. 3:19-CV-00073 (VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *Gonzalez,* 2020 WL 1536155, at *3; *United States v. Muniz,* No. 4:09-CR-0199-1, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020); *United States v. Campagna,* No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020). Unlike the above cases, Petitioner's compassionate release is not justified under the circumstances.

First, Petitioner does not show a potential susceptibility to serious health risks from COVID-19. Petitioner alleges that he is at higher risk of serious illness if he contracts COVID-19 because "[t]hough he has not been diagnosed with hypertension his history aligns him with individuals who suffer with the disease." ECF No. 122 at 2. However, according to his BOP medical records, Petitioner was denied a diagnosis for hypertension on July 22, 2020. ECF No. 131 (Sealed). Then, between September 2020 and January 2021, Petitioner was evaluated periodically for hypertension but there was no evidence to warrant a formal diagnosis. Moreover,

5

his medical records indicate that in October 2019 he was diagnosed with congenital pes planus, antisocial personality disorder, hypermetropia, gingival recession, disorder of teeth, and joint paint. *Id.* at 6. According to the Centers for Disease Control and Prevention ("CDC"), individuals with hypertension or high blood pressure *might* be at an increased risk for severe illness if they contract the virus.[1] However, Petitioner's medical records do not indicate that his blood pressure place him at high risk. *See id.* Petitioner also states that the mere presence of COVID-19 at Thomson USP warrants extraordinary and compelling reasons for release. *Id.* Unlike other cases, the Court here does not need to speculate about the impact COVID-19 would have on Petitioner's health should he contract COVID-19 because Petitioner already did contract COVID-19 on December 8, 2020. As a result, Thomson USP followed protocol to isolate Petitioner in compliance with the Centers for Disease Control guidelines. Based on his medical records, Petitioner recovered without any issues. Accordingly, the Court finds that Petitioner has not presented any evidence showing extraordinary or compelling reasons that he is at particularized risk of serious illness should be contract COVID-19.

Second, however, Petitioner does show a potential risk of contracting the disease at his prison facility. Most critically, Petitioner already contracted COVID-19 at USP Thomson. As of April 7, 2021, the BOP has reported a total of 542 positive cases of COVID-19 for inmates and 100 for staff at Tomson USP.[2] Moreover, increased testing is showing that COVID-19 has rapidly spread throughout prisons all over the country.[3] Despite the BOP's protection measures, individuals housed in prisons remain particularly vulnerable to infection. *See Muniz*, 2020 WL 1540325, at *1; *see also Esparza*, 2020 WL1696084, at *1 (noting that "[e]ven in the best run

---

[1] *Id.*
[2] *See* Federal Bureau of Prisons, "COVID-19 Corona Virus," *BOP.gov,* https://www.bop.gov/coronavirus/
[3] *See* Centers for Disease Control and Prevention, "Coronavirus Disease 2019: Cases in the US," *CDC.gov,* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

6

prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of at least six feet from others"). Therefore, the Court need not wait until an outbreak occurs at a specific prison facility to determine that a petitioner has a particularized risk of contracting the disease. *See Zukerman*, 2020 WL 1659880, at \*6 *citing Rodriguez*, 2020 WL 1627331, at \* 12 ("the Court did not intend for that sentence to include incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic").

Third, the § 3553(a) factors do not weigh in favor of Petitioner's compassionate release. The seriousness of Petitioner's conduct for his underlying offense remain unchanged. According to his PSR, Petitioner entered a Shell Gas Station in Newport News, ordered everyone to the ground, pushed a customer standing at the counter out of the way and pulled out the firearm. ECF No. 115 at ¶ 5. Petitioner went behind the counter of the gas station, just feet from where the clerk was standing, and demanded "give it up, give it up," all while holding the firearm at his waist and pointing the barrel at the clerk. *Id.* When the clerk opened the register, Petitioner took approximately $131 and stuffed it into his pockets. Petitioner then patted down two victims that were laying on the floor and then left the store. *Id.* After Petitioner was detained by police, he was transported to the scene of the crime where a "show up" was conducted and the victim identified him. *Id.* Later that day, Petitioner had a telephone conversation with a confidential source wherein he directed the source, in coded language, to return to the scene to find the victim. *Id.* at ¶¶ 7-13. Petitioner asked the source whether he observed if anyone had picked up the firearm Petitioner had discarded during the foot pursuit. *Id.* A second confidential source admitted to investigators that Petitioner also wanted the source to threaten the victim. *Id.* On March 5, 2013, Petitioner was released from custody and he displayed a weapon to the second confidential source boasting, "I

even got my junk back." *Id.* On March 8, 2013, Petitioner was pulled over by a detective who positioned his vehicle parallel to the Petitioner's vehicle to prevent Petitioner's exit from the vehicle. *Id.* at ¶ 14. The detective exited his vehicle, identified himself and instructed Petitioner to exit the vehicle. *Id.* Petitioner then accelerated rapidly, striking the vehicle parked in front of him, and left the scene. *Id.* Petitioner drove through a red light and struck a vehicle, resulting in a four-car accident. *Id.* Petitioner fled the scene of the accident. Petitioner was later apprehended. *Id.*

Petitioner also has an extensive career criminal record, starting at age 10, when he was convicted of Breaking and Entering and Set Fire to a Building. *Id.* at ¶ 29. Then, between the ages of 11 and 17, Petitioner was convicted of several crimes including Grand Larceny, Shoplifting, Trespassing, Assault and Battery, Burglary, and Reckless Handling of a Firearm. *Id.* at ¶¶ 30-39. As an adult, from ages 19 to 25, Petitioner was convicted of various crimes including Criminal Contempt, Assault and Battery of Police Officer, Eluding Police, and Driving Without a License. *Id.* at ¶¶ 40-43. Accordingly, Petitioner was assessed a total offense level of 23, a criminal history category IV, and a recommended guideline provision of 70 to 87 months, plus 84 months, consecutive, imprisonment *Id.* at ¶¶ 111-113. As a result of his crimes and career criminal history, Petitioner was sentenced to One Hundred Forty-Four (144) months imprisonment, consisting of 60 Months on Count One and 84 Months on Count Two, all to be served consecutively, and followed by five years of supervised release. ECF Nos. 76, 78. To date, Petitioner has served about 70 percent of his sentence is scheduled for release on November 27, 2023. ECF No. 127.

While in prison, Petitioner has not demonstrated a record of rehabilitation. Petitioner's disciplinary record shows that he received multiple infractions including: Possessing Drugs/Alcohol (2016), Refusing Work/Program Assignment (2017), Engaging in Sexual Acts, and Indecent Exposure (2017), Destroying Property (2018), Assaulting Without Serious Injury (2018),

Refusing to Obey an Order (2019), Threaten Bodily Harm (2020), Assaulting Without Serious Injury (2020), Possessing a Dangerous Weapon (2020), and Engaging in Sexual Acts (2020). ECF No. 127; *see also,* ECF No. 128 at Exhibit 4. To his credit, Petitioner has completed multiple academic and drug education courses and is working in food service. ECF No. 128 at Exhibit 3.

Overall, given the seriousness of Petitioner's crimes and criminal history, the Court finds that Petitioner's release would not promote the respect for law or provide adequate deterrence. Furthermore, the Court finds that Petitioner is a risk to the community. Also, Petitioner has not demonstrated any extraordinary and compelling reasons to warrant compassionate release. Accordingly, the § 3553(a) factors do not weigh in his favor. Therefore, based on the aforementioned factors, the Court finds that Petitioner does not qualify for compassionate release.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's motion through counsel, ECF No. 122, is **DENIED.** Furthermore, Petitioner's additional *pro se* motions, ECF Nos. 112, 116, are **Moot**.

The Clerk is **DIRECTED** to send a copy of this Order to the Petitioner, the United States Attorney, the United States Probation Office, the Federal Bureau of Prisons, and the United States Marshals Service.

**IT IS SO ORDERED**.

Newport News, Virginia
April 7 , 2021

UNITED STATES DISTRICT JUDGE